Dan Stormer, Esq. [S.B. # 101967]
Brian Olney, Esq. [S.B. #298089]
Barbara Enloe Hadsell, Esq. [S.B. #086021]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
          bolney@hadsellstormer.com
          bhadsell@hadsellstormer.com

Joshua Piovia-Scott, Esq. [S.B. #222364]
HADSELL STORMER & RENICK LLP
4300 Horton Street, #15
Emeryville, CA 94608
Telephone: (415) 685-3591
Facsimile: (626) 577-7079
Email: jps@hadsellstormer.com

Attorneys for Plaintiffs

[Additional counsel cont. on next page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HELEINE TCHAYOU, ISAAC KEUNANG, LINE MARQUISE FOMING, and ESTATE OF CHARLY LEUNDEU KEUNANG, by and through LINE MARQUISE FOMING, as Administrator,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, CHAND SYED, FRANCISCO MARTINEZ, DANIEL TORRES, and JOSHUA VOLASGIS,<br><br>Defendants. | Case No.: CV-16-6073-TJH(MRWx)<br><br>**FIRST AMENDED COMPLAINT:**<br><br>1. 42 U.S.C. § 1983 - Excessive Force<br>2. 42 U.S.C. § 1983 - Unlawful Entry<br>3. 42 U.S.C. § 1983 - Wrongful Death<br>4. 42 U.S.C. § 1983 - First Amendment Retaliation<br>5. 42 U.S.C. § 1983 - Failure to Intervene<br>6. 42 U.S.C. § 1983 - Deprivation of the Rights of Plaintiffs to Familial Relationship with Decedent<br>7. Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.*<br>8. Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 791 *et seq*. |

FIRST AMENDED COMPLAINT

9. Wrongful Death: Negligence
10. Survivorship: Negligence
11. Survivorship: Assault
12. Survivorship: Battery
13. Survivorship: California Constitution, Art. 1, § 13
14. Negligent Infliction of Emotional Distress
15. Violation of Civil Code § 52.1 (Bane Act)

**DEMAND FOR JURY TRIAL**

1

[Additional counsel cont. from first page]

2

Marc Williams [S.B. #198913]
Reuven Cohen [S.B. #231915]
3 DORDI WILLIAMS COHEN LLP
724 South Spring Street, Suite 903
4 Los Angeles, CA 90014
Tel: (213) 232-5160
5 Fax: (213) 232-5167
Emails: mwilliams@dordiwilliamscohen.com
6         rcohen@dordiwilliamscohen.com

7 Emmanuel Nsahlai [S.B. #207588]
Nsahlai Law Firm
8 3460 Wilshire Blvd., Suite 1220
Los Angeles, CA 90010
9 Telephone: (213) 674-4181
Facsimile: (213) 973-4617
10 Email: nsahlai.e@nsahlailawfirm.com

11 Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

# I.    INTRODUCTION

1.    On March 1, 2015, two officers and a sergeant of the Los Angeles Police Department fired six bullets, several at point blank range and four of them lethal, into unarmed Charly Leundeu Keunang ("Mr. Keunang"), killing him. Mr. Keunang, a native of Cameroon, West Africa, was at the time 43 years old, homeless, and presumed to be mentally ill. A religious man, at the time of the killing Mr. Keunang had made his home in a tent underneath a large cross displayed on a church located in the heart of skid row in downtown Los Angeles.  Even though Mr. Keunang had only lived on skid row for a short time before his death, he was a known figure who had volunteered at a nearby homeless shelter.

2.    Prior to shooting him, the involved officers—Sergeant Syed, Officer Martinez, Officer Torres, and Officer Volasgis (collectively the "Officer Defendants")— engaged in lengthy discourse with Mr. Keunang who stood outside of his tent on the sidewalk bordering the heavily trafficked street. Mr. Keunang did not appear violent and was not armed in any manner. On information and belief, Mr. Keunang repeatedly told the officers, "Let me express myself," and "If you let me express myself, maybe you may have a chance to explain why you're doing this right now." After calmly talking to the four police officers surrounding him for approximately three and one-half minutes, Mr. Keunang crawled into his tent. In retaliation for Mr. Keunang's statements, the officers then exploded into acts of violence, almost certain to cause anyone, much less a person suspected of suffering from mental illness, to panic. Violently pulling and pounding on the tent and attempting to collapse and rip it off of Mr. Keunang who was hovering defenseless inside, the officers succeeded in reaching inside the tent and pulling Mr. Keunang, terrified, out of the tent.

3.    On information and belief, the Defendant police officers approached Mr. Keunang in the first instance as a result of a complaint by another homeless individual who advised that Mr. Keunang suffered some sort of mental illness which at times caused him to act out. Despite being provided information that Mr. Keunang was possibly

mentally ill, the officers heightened to a fever pitch what had previously been a relatively calm interaction with Mr. Keunang. Upon dragging him out of the tent, one or more of the by now six officers who had reported to the scene repeatedly tased Mr. Keunang, punched and swung their batons at him, hitting him on repeated occasions, and pinned him on the ground. While they had Mr. Keunang pinned to the ground, Sergeant Syed, Officer Martinez, and Officer Torres needlessly and without justification fired their weapons into the defenseless Mr. Keunang, mortally wounding him. At no time did Mr. Keunang possess any type of weapon, much less fire or remove any firearm from the officers. Mr. Keunang was observed by bystanders to be alive and writhing in pain for a time before he expired, during which time Defendants stood around on the sidewalk, making no attempt to tend to his wounds or otherwise come to his aid.

4.     The killing occurred in broad daylight. Witnesses on the crowded street attest Mr. Keunang was unarmed and that the police could have subdued him by other than lethal means. A mere 60 seconds passed from the moment police dragged Mr. Keunang from the tent to when he lay in his own blood, dying in front of passersby beneath the very cross under which he had planted his tent for protection.

5.     The killing of Charly Keunang represents a classic case of abuse of power and deadly force by a supposedly trained police force, resulting in what Los Angeles Police Chief Beck himself characterized as a "tragic death." The inexplicable volatility with which the Defendant officers accosted Mr. Keunang resulted in the deprivation of his life, a mother and father of their son and a loving sister of her only sibling.

6.     If Defendants had followed protocols, policies, procedures and training that are standard in their field and required by law, they would have taken less than lethal measures to handle the situation rather than to senselessly inflame it as they did. For example, the officers could have continued to engage Mr. Keunang in verbal conversation rather than escalating the situation by physically threatening and then tasing him. In addition, one or more of the six officers who eventually reported to the scene could have requested Mr. Keunang's permission to enter his tent while Mr. Keunang was standing

outside it talking to officers to determine if any danger existed therein to Mr. Keunang, members of the public or the police officers themselves. They did no such thing. Similarly, rather than storming his tent once Mr. Keunang crawled inside, the officers could have taken other measures to de-escalate the situation. Further, on information and belief, the police had reason to suspect Mr. Keunang was mentally ill. Despite this, Defendants failed and refused to assess Mr. Keunang's mental state and risk factors or otherwise intervene in such a way as to protect him and the public. Likewise, Defendants failed to have in place appropriate policies and procedures to deal with such situations, or in the alternative, if such policies and procedures existed, they flaunted them. In sum, in committing the acts and failures to act alleged herein, Defendants failed in their duties as a public safety agency and as employees and servants of the public.  As a result, Plaintiffs lost their loved one - their only son and brother.

7.      Defendants have publicly claimed that Mr. Keunang supposedly grabbed one of the officer's holstered gun. These statements are disproved by publicly available video recordings of the incident, public statements of eyewitnesses as well as, on information and belief, the video recording from the body cameras worn by two of the officers involved.

8.      Plaintiffs bring this action for damages against Defendants for: general, compensatory, and statutory damages, costs and attorneys' fees, declaratory relief and training resulting from Defendants' unlawful and egregious conduct, as alleged herein. Additionally, Plaintiffs seek punitive damages against the individual Defendants.

## II.      PARTIES

9.      Plaintiff Heleine Tchayou is the mother of Charly Leundeu Keunang and has lived in the United States since 2013 with her daughter. Charly Leundeu Keunang is her only son.

10.      Plaintiff Isaac Keunang is the father of Charly Leundeu Keunang. Isaac Keunang is a citizen and resident of Cameroon, West Africa. Charly Leundeu Keunang is his only son.

FIRST AMENDED COMPLAINT              -3-

11.     Plaintiffs brings this action pursuant to California Code of Civil Procedure §§ 377.30 and 377.60, incorporated herein by virtue of 42 U.S.C. § 1988. The survival causes of action in this matter are based on violations of Charly Keunang's rights under the United States Constitution and laws of the United States, as well as Article 1, section 13 of the California Constitution and the common law.

12.     Plaintiff Line Marquise Foming is the sister and sole sibling of Charly Leundeu Keunang. Ms. Foming emigrated to the United States in 2006, became a naturalized citizen in 2011, and works as a nurse's assistant for the Commonwealth of Massachusetts. In addition to claims brought on her own behalf, Ms. Foming also brings claims as the Special Administrator of the Estate of Charly Leundeu Keunang.

13.     Defendant City of Los Angeles ("the City") was and is a legal political entity established under the laws of the State of California, with all the powers specified and necessarily implied by the Constitution and laws of the State of California and exercised by a duly elected City Council and/or their agents and officers. The City is responsible for the actions, inactions, policies, procedures, practices and customs of the Los Angeles Police Department ("LAPD") and its agents and employees. At all relevant times, the City was and continues to be responsible for assuring that the actions of the Los Angeles Police Department and its agents and employees comply with the Constitutions of the State of California and of the United States and any other applicable laws and regulations.

14.     Defendant Sergeant Chand Syed is an employee of the LAPD who, on information and belief, detained, accosted, needlessly and without justification injured and fatally shot Mr. Keunang.

15.     Defendant Officer Francisco Martinez is an employee of the LAPD who, on information and belief, detained, accosted, needlessly and without justification injured and fatally shot Mr. Keunang.

16.     Officer Daniel Torres is an employee of the LAPD who, on information and belief, detained, accosted, needlessly and without justification injured and fatally shot Mr. Keunang.

17.     Officer Joshua Volasgis is an employee of the LAPD who, on information and belief, detained, accosted, and needlessly and without justification contributed to Mr. Keunang being injured and fatally shot. Officer Volasgis's unlawful actions include, but are not limited to, employing excessive force by repeatedly punching Mr. Keunang in the face.

18.     Defendants Chand Syed, Francisco Martinez, Daniel Torres, and Joshua Volasgis engaged in the acts or omissions alleged herein under color of state law.

19.     Plaintiffs are informed and believe and thereon allege that at all times relevant herein, Defendants and each of them were the agents, employees, servants, joint venturers, partners, and/or co-conspirators of the other Defendants named in this Complaint and that at all times, each of the Defendants was acting within the course and scope of said relationship with Defendants.

20.     Plaintiffs are informed and believe, and thereupon allege, that at all times material herein, each of the Defendants was the agent or employee of, and/or working in concert with, his/her co-Defendants and was acting within the course and scope of such agency, employment and/or concerted activity. Plaintiffs allege that to the extent certain acts and omissions were perpetrated by certain Defendants, the remaining Defendant or Defendants confirmed and ratified said acts and omissions.

21.     Plaintiffs are informed and believe and thereupon allege, that at all times material herein, each Defendant was dominated and controlled by his/her co-Defendant and each was the alter-ego of the other.

22.     Whenever and wherever reference is made in this complaint to any act or failure to act by a Defendant or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly and severally.

23.     Plaintiffs Heleine Tehayou (on April 29, 2015), Isaac Keunang and Line Marquise Foming (on May 5, 2015), and Estate of Charly Leundeu Keunang (August 26, 2015) exhausted their administrative remedies by filing governmental tort claims with the

City of Los Angeles, pursuant to California Government Code § 910.  By correspondence dated September 3, 2015, the City of Los Angeles rejected the governmental tort claim filed on behalf of the Estate of Charly Leundeu Keunang.  The City of Los Angeles did not respond to the governmental tort claims filed by Heleine Tehayou, Isaac Keunang, or Line Marquise Foming within 45 days after the claims were filed, or at any time since, thereby rejecting the claims pursuant to Government Code § 912.4(c).

## III.      FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

24.      Decedent Charly Leundeu Keunang was born in Cameroon, West Africa, to Plaintiffs Heleine Tchayou and Isaac Keunang. Mr. Keunang studied physics and mathematics at the University of Douala. Thereafter, Mr. Keunang, a native French speaker, lived in France for an extended period of time, eventually emigrating to the United States in approximately 1999.

25.      Following release from prison due to incarceration on a bank robbery conviction, Mr. Keunang stayed in a halfway house and thereafter with a friend. For a brief few months before his death, Mr. Keunang made his home in a tent in the skid row area of downtown Los Angeles. Though a relative newcomer to the street, Mr. Keunang did what he could for others, for example, volunteering on occasion at a "soup kitchen" feeding Los Angeles' large homeless population. On information and belief, a very large percentage of the homeless living on the streets of Los Angeles suffer from some form of mental illness and/or drug addiction. On further information and belief, the Los Angeles Police Department purports to specially train officers assigned to the City's skid row district on how to interface and peaceably interact with this population so as to protect the homeless as well as the general population.

26.      Determined to turn his life around upon release from prison, Mr. Keunang was able to locate his sister, Plaintiff Foming, who had ceaselessly searched for him since losing contact over a decade before. Mr. Keunang's mother, who lived in Massachusetts with Ms. Foming and her family, despaired of ever seeing her only son again as she presumed he was dead.  In approximately June 2014, Plaintiff Foming arranged for Mr.

Keunang to travel by bus to Massachusetts and surprise their mother, who was unaware that her only two children had recently found each other again. Plaintiffs Tchayou and Foming were elated at seeing their prodigal son and brother again after so many years.

27.     Following their joyful reunion in Massachusetts and Mr. Keunang's return to Los Angeles, the three remained in nearly daily contact with each other by telephone and email. Plaintiffs Tchayou and Foming informed Plaintiff Isaac Keunang of the re-discovery of Mr. Keunang, and Isaac Keunang spoke repeatedly with his son and about his plans to return to Cameroon.

28.     Reconnecting with his family intensified Mr. Keunang's resolve to begin his life anew. He formulated a plan to return to his native Cameroon to start up an import and export enterprise with a friend who was based in Los Angeles. Mr. Keunang intended to assist in the support of his aging parents and was actively engaged in measures to effectuate that intent at the time of his death. Though living on the streets of Los Angeles, Mr. Keunang was not without hope. A religious man, he purposefully planted his tent beneath a cross affixed to a large church ministering to the poor and homeless near the corner of San Pedro and 5th streets in the skid row area of downtown Los Angeles. This is where Mr. Keunang lived in the days leading up to March 1, 2015.

29.     At approximately noon on that Sunday, another homeless man made a complaint that Mr. Keunang, with whom the other homeless man had argued shortly before and whom the other homeless man described as mentally ill, had attacked him. On information and belief, Mr. Keunang and this other homeless man argued because Mr. Keunang believed the other man had improperly harassed a woman. Video of the Mr. Keunang's interaction with this man shows Mr. Keunang pushing his tent into the street but not physically assaulting him. LAPD officers were summoned to the scene where they approached Mr. Keunang. The officers and Mr. Keunang spoke together with relative calm at considerable length together on the heavily trafficked street where adults, young children, persons in wheelchairs, babies in strollers and leashed pets walked, bicycled and drove, weaving their way among and around the officers and Mr. Keunang. On

information and belief, the audio from the officers' body cameras shows that Mr. Keunang was trying to explain to the officers what happened with the other man. Video footage from a security camera installed in a nearby building shows Mr. Keunang calmly engaged in discussion with the officers who made no attempt to keep the numerous onlookers, bicyclists and pedestrians from the scene.  This same video shows Mr. Keunang standing with arms at his side or mildly gesturing, engaging in conversation with the initial three and eventually four police officers who encircled him. He appears relaxed and is completely unarmed. On information and belief, Mr. Keunang repeatedly told the officers, "Let me express myself," and "If you let me express myself, maybe you may have a chance to explain why you're doing this right now."

30.    After approximately three and one-half minutes of interaction with the police officers, Mr. Keunang stooped down to the ground and crawled back into his tent. This action, together with Mr. Keunang's statements, apparently angered the officers who had by now grown in number to six, as a third police car had driven up. Three of the police officers became instantly volatile, seizing the tent with Mr. Keunang inside. They began violently rocking the tent, attempting to rip the top off or to otherwise dismantle it or tear it down. Other officers drew tasers and commenced firing into the tent. One or more of the officers reached into the collapsing tent in an attempt to pull a by now frantic Mr. Keunang out of it. The videotaped security footage shows the police officers repeatedly tasing and punching Mr. Keunang. Upon being dragged from the tent with police batons and tasers pointed or being thrust at and striking him, Mr. Keunang panicked and began flailing his arms in desperate attempts to disengage from the officers grappling him. The officers repeatedly struck Mr. Keunang with their fists and batons, tackling him and knocking him to the concrete sidewalk where at least one officer sat on him, pinioning him down. At no point in time did Mr. Keunang hold a weapon of any kind as he was being besieged by six heavily armed and violent police officers.

31.    Charlie Beck, the Chief of the Los Angeles Police Department, has been quoted by the Los Angeles Times as stating that Mr. Keunang "forcibly grabbed one of

1   the officer's holstered pistols." On information and belief, this did not occur. The video of

2   the incident taken by a bystander does not show Mr. Keunang reaching for any of the

3   officers' guns. The media reports from the reporter who has been allowed to view the

4   footage from the officers' body cameras state that this footage does not show Mr.

5   Keunang reaching for any of the officers' weapons. Numerous eye witnesses have stated

6   that they did not see Mr. Keunang reach for any of the officers' guns. Despite this, the

7   Defendant officers drew their weapons and needlessly and without justification fired six

8   shots into Mr. Keunang's chest, lungs, heart, arms and other body parts. Within 60

9   seconds of being dragged forcibly from his "home," Mr. Keunang, a homeless unarmed

10  black man whom the officers had reason to believe suffered from a mental illness, lay

11  dying. Defendants failed and refused to assist Mr. Keunang or engage in any efforts to

12  offer medical aid or otherwise save him. Instead, Defendants handcuffed Mr. Keunang's

13  bloody wrists and looked on while he bled to death in pain and terror on the streets of Los

14  Angeles.

15       32.    Each of the Officer Defendants was both personally involved and an integral

16  participant in the violation of Mr. Keunang's constitutional rights because each officer

17  was aware of the unlawful seizure, unlawful entry into Mr. Keunang's tent, and the

18  unlawful use of force; each officer did not object to these violations of Mr. Keunang's

19  rights; and each officer participated in the violations by performing police functions,

20  including meaningful participation in the needless and unnecessary operation to escalate

21  the encounter with Mr. Keunang and use unjustified force, including lethal force. Rather

22  than de-escalate the situation, the LAPD officers used unjustified lethal force, in violation

23  of LAPD protocol. On information and belief, despite their knowledge that a sizeable

24  percentage of the homeless persons living on the streets of Los Angeles' skid row district

25  suffer from mental illness and having been specifically put on notice that Mr. Keunang

26  potentially was mentally ill, Defendants engaged in explosive, unpredictable and violent

27  behavior nearly guaranteed to terrify anyone, much less a person suspected of suffering

28  from a mental illness.

FIRST AMENDED COMPLAINT                    -9-

33.     The Los Angeles County Coroner's autopsy report reveals four of the bullets were lethal, entering Mr. Keunang's chest cavity, fracturing three ribs, partly collapsing his lungs, and causing traumatic damage to his heart, liver, and surrounding muscle. One or other of the Defendant officers fired two other bullets into Mr. Keunang's external limbs, fracturing bones and damaging muscle.

34.     The senseless violence exerted by Defendants on an unarmed terrified man recklessly caused Mr. Keunang's unnecessary and untimely death.

35.     On the day before he died, Mr. Keunang communicated with his sister, Plaintiff Foming, telling her he would call her March 1. Worried that her brother had not telephoned as he had promised, Foming unsuccessfully attempted to reach him.

36.     Despite knowledge of the existence and whereabouts of Plaintiffs Tchayou and Foming, Defendant City failed and refused to notify them of the death of their son and sibling. Indeed, on March 1, 2015, Plaintiffs watched a televised broadcast of the shooting of a black man on the streets of Los Angeles on the evening news, unaware that the man they viewed dying in front of their eyes was their son and brother. Days went by and still Defendant City failed and refused to notify Mr. Keunang's kin of his death.

37.     It was not until March 3 that Plaintiffs Tchayou and Foming learned of the death of Mr. Keunang. This occurred via a telephone call in the middle of the night from an acquaintance in Cameroon, who told them that the man seen shot to death in the widely televised video footage was their son and brother. It is a supreme irony that someone located half way around the world learned of the death of Mr. Keunang before his mother and sister, living in one of the most technologically advanced countries in the world.

38.     Although Plaintiffs repeatedly requested the release of the footage from the officers' body cameras, for over a year, Defendants refused to release it to anyone other than a reporter writing a story about this incident for the magazine GQ.

\\\

\\\

\\\

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST CAUSE OF ACTION**

**42. U.S.C. § 1983 – SURVIVAL ACTION**

**(Fourth and Fourteenth Amendments: Unreasonable Seizure – Excessive Force)**

**(By - Plaintiff Estate of Charly Leundeu Keunang)**

**(Against – All Defendants)**

39.    Plaintiff realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

40.    This claim for relief arose in Charly Keunang's favor, and Charly Keunang would have been the Plaintiff with respect to this claim for relief had he lived.

41.    All of the acts of Defendants and the persons involved were done under color of state law.

42.    The acts of the Officer Defendants deprived Charly Keunang of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, subjecting him to unreasonable and excessive force. The Officer Defendants and the involved officers unreasonably beat, tased, and repeatedly shot Mr. Keunang at point blank range without justification, resulting in his death.

43.    The Officer Defendants' decision to force a violent and unnecessary confrontation with Charly Keunang was objectively unreasonable and a violation of Charly Keunang's Fourth Amendment rights. There was no need for the Officers to unreasonably agitate or excite Mr. Keunang. The Officers had numerous alternatives. For example, they could have used nonthreatening communications, employed the passage of time to their advantage by taking the time to assess the situation and give Mr. Keunang time to calm down. The Officers had no reason to believe that a delay in entering Mr. Keunang's tent would cause serious harm, especially weighed against the likelihood that forcing a confrontation would escalate matters and lead to the use of force or even deadly force, as occurred here. On information and belief, the Officers were also aware that Mr.

Keunang was mentally ill and emotionally disturbed, and was not likely to respond rationally to officers firing their tasers into his tent and then attempting to collapse the tent with Mr. Keunang inside before dragging him out. Even if the Officers believed they had probable cause to arrest Mr. Keunang, which they did not, there was no immediate need to subdue him and take him into custody while he remained in the confined area of his tent, and the force the Officers applied was excessive and unreasonable.

44.     Each of the Officer Defendants was both personally involved and an integral participant in the violation of Mr. Keunang's constitutional rights because each officer was aware of the unlawful actions of the other Officers, did not object to these violations of Mr. Keunang's rights, and participated in the violations by performing police functions, including meaningful participation in the needless and unnecessary operation to escalate the encounter with Mr. Keunang and use unjustified force, including lethal force.

45.     As a direct and proximate result of the aforementioned acts of the Officer Defendants, Mr. Keunang sustained and incurred damages for a measurable period of time before his death, including pain and suffering, emotional injury, and a loss of the enjoyment of life and other hedonic damages as he lay writhing in pain and bleeding to death on the streets of Los Angeles in the view of bystanders and Defendant police officers who did nothing to come to his aid.

46.     In doing the foregoing wrongful acts, Defendants, and each of them, acted in reckless and callous disregard for the constitutional rights of Charly Keunang. The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of punitive damages against each individual Officer Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

47.     The Officer Defendants and the other involved officers acted pursuant to expressly adopted official policies or longstanding practices or customs of the City of Los Angeles.  These include policies and longstanding practices or customs on warrantless entries and the use of force, including lethal force, in situations including but not limited

to encounters with individuals on skid row who are homeless and suffer from mental illness and/or drug addiction.

48.    In addition, the training policies of the City of Los Angeles were not adequate to train its officers to handle the usual and recurring situations with which they must deal, including but not limited to encounters with individuals on skid row who are homeless and suffer from mental illness and/or drug addiction.  The City of Los Angeles knew that its failure to adequately train its officers to interact with homeless individuals on skid row suffering from mental illness and/or drug addiction made it highly predictable that its officers would engage in conduct that would deprive persons such as Mr. Keunang of their rights. The City of Los Angeles was thus deliberately indifferent to the obvious consequences of its failure to train its officers adequately.

49.    Defendant City of Los Angeles' official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of Charly Keunang by Officers Syed, Martinez, Torres, Volasgis, and the other involved officers; that is, the City of Los Angeles's official policies and/or longstanding practices or customs are so closely related to the deprivation of Mr. Keunang's rights as to be the moving force that caused his injuries.

50.    LAPD Chief Charlie Beck, a final policymaker for the City of Los Angeles, ratified the actions and omissions of the Defendant Officers and the other involved officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.

## SECOND CAUSE OF ACTION

### 42. U.S.C. § 1983 – SURVIVAL ACTION

### (Fourth and Fourteenth Amendments: Unreasonable Warrantless Entry)

### (By - Estate of Charly Leundeu Keunang)

### (Against – All Defendants)

51.    Plaintiff realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

FIRST AMENDED COMPLAINT                    -13-

52.     This claim for relief arose in Charly Keunang's favor, and Charly Keunang would have been the Plaintiff with respect to this claim for relief had he lived.

53.     All of the acts of Defendants and the persons involved were done under color of state law.

54.     The acts of the Officer Defendants deprived Charly Keunang of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, making an unlawful warrantless entry into the tent which Mr. Keunang used as habitation without exigent circumstances, consent, or probable cause. On information and belief, Defendants had reason to believe that Mr. Keunang suffered from a mental illness. Until they violently attacked and provoked him, and forcibly dragged him out of his tent, Mr. Keunang was acting in a calm and noncombative manner.

55.     The Defendant Officers' decisions to enter Mr. Keunang's tent and force a confrontation with him were objectively unreasonable. There was no need for the Officers to unreasonably agitate or excite Mr. Keunang. The Officers had numerous alternatives. For example, they could have used nonthreatening communications, employed the passage of time to their advantage by taking the time to assess the situation and give Mr. Keunang time to calm down. The Officers had no reason to believe that a delay in entering Mr. Keunang's tent would cause serious harm, especially weighed against the likelihood that forcing a confrontation would escalate matters and lead to the use of force or even deadly force, as occurred here. Even if the Officers believed they had probable cause to arrest Mr. Keunang, which they did not, there was no immediate need to subdue him and take him into custody while he remained in the confined area of his tent. On information and belief, the Officers were also aware that Mr. Keunang was mentally ill and emotionally disturbed, and was not likely to respond rationally to officers firing their tasers into his tent and then attempting to collapse the tent with Mr. Keunang inside before

1   dragging him out.

2   56.    Each of the Officer Defendants was both personally involved and an integral

3   participant in the violation of Mr. Keunang's constitutional rights because each officer

4   was aware of the unlawful actions of the other Officers, did not object to these violations

5   of Mr. Keunang's rights, and participated in the violations by performing police functions,

6   including meaningful participation in the needless and unnecessary operation to escalate

7   the encounter with Mr. Keunang and unlawfully enter the tent he used as his home.

8   57.    As a direct and proximate result of the aforementioned acts of then Officer

9   Defendants, Mr. Keunang sustained and incurred damages for a measurable period of time

10   before his death, including pain and suffering, emotional injury, and a loss of the

11   enjoyment of life and other hedonic damages as he lay writhing in pain and bleeding to

12   death on the streets of Los Angeles in the view of bystanders and Defendant police

13   officers who did nothing to come to his aid.

14   58.    In doing the foregoing wrongful acts, Defendants, and each of them, acted in

15   reckless and callous disregard for the constitutional rights of Charly Keunang. The

16   wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus

17   warranting the award of punitive damages against each individual Officer Defendant (but

18   not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future

19   misconduct.

20   59.    The Officer Defendants and the other involved officers acted pursuant to

21   expressly adopted official policies or longstanding practices or customs of the City of Los

22   Angeles.  These include policies and longstanding practices or customs on warrantless

23   entries in situations including but not limited to encounters with individuals on skid row

24   who are homeless and suffer from mental illness and/or drug addiction.

25   60.    In addition, the training policies of the City of Los Angeles were not

26   adequate to train its officers to handle the usual and recurring situations with which they

27   must deal, including but not limited to encounters with individuals on skid row who are

28   homeless, live in tents, and/or suffer from mental illness and/or drug addiction.  The City

FIRST AMENDED COMPLAINT                   -15-

of Los Angeles knew that its failure to adequately train its officers to interact with homeless individuals on skid row suffering from mental illness and/or drug addiction made it highly predictable that its officers would engage in conduct that would deprive persons such as Mr. Keunang of their rights. The City of Los Angeles was thus deliberately indifferent to the obvious consequences of its failure to train its officers adequately.

61.     Defendant City of Los Angeles' official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of Charly Keunang by Officers Syed, Martinez, Torres, Volasgis, and the other involved officers; that is, the City of Los Angeles's official policies and/or longstanding practices or customs are so closely related to the deprivation of Mr. Keunang's rights as to be the moving force that caused his injuries.

62.     LAPD Chief Charlie Beck, a final policymaker for the City of Los Angeles, ratified the actions and omissions of the Defendant Officers and the other involved officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.

**THIRD CAUSE OF ACTION**

**42 U.S.C. § 1983 – WRONGFUL DEATH**

**(Fourth and Fourteenth Amendments: Excessive Force)**

**(By - Plaintiffs Heleine Tchayou and Isaac Keunang)**

**(Against – All Defendants)**

63.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

64.     All of the acts of Defendants and the persons involved were done under color of state law.

65.     The acts of the Officer Defendants relating to the killing of Charly Keunang deprived Charly Keunang of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth

Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, provoking a violent and unnecessary confrontation with Charly Keunang in violation of his Fourth Amendment rights, leading to Defendants shooting Charly Keuanng and killing him where no deadly force was justified.

66.     Each of the Officer Defendants was both personally involved and an integral participant in the violation of Mr. Keunang's constitutional rights because each officer was aware of the unlawful actions of the other Officers, did not object to these violations of Mr. Keunang's rights, and participated in the violations by performing police functions, including meaningful participation in the needless and unnecessary operation to escalate the encounter with Mr. Keunang and use unjustified lethal force.

67.     Plaintiffs are the proper parties with standing pursuant to Cal. Civ. Proc. Code § 377.60(a) (incorporated herein by virtue of 42 U.S.C. § 1988), to pursue their remedies for wrongful death, including pecuniary loss and other compensable injuries resulting from loss of love, society, comfort, attention, services, and support of Charly Keunang.

68.     As a direct and proximate result of the acts of Defendants, Plaintiffs Heleine Tchayou and Isaac Keunang have been damaged, including pecuniary loss and other compensable injuries resulting from loss of love, society, comfort, attention, services, and support of the decedent, in an amount in accordance with proof.

69.     As a further direct and proximate result of the acts of Defendants, as alleged above, Plaintiffs have incurred funeral and burial expenses, including but not limited to transporting Mr. Keunang's body back to Cameroon to join his ancestors, in an amount to be proven at trial.

70.     In doing the foregoing wrongful acts, Defendants, and each of them, acted in reckless and callous disregard for the constitutional rights of Charly Keunang. The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of punitive damages against each individual Officer Defendant (but

1    not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future
2    misconduct.

3         71.    The Officer Defendants and the other involved officers acted pursuant to
4    expressly adopted official policies or longstanding practices or customs of the City of Los
5    Angeles.  These include policies and longstanding practices or customs on warrantless
6    entries and the use of force, including lethal force, in situations including but not limited
7    to encounters with individuals on skid row who are homeless and suffer from mental
8    illness and/or drug addiction.

9         72.    In addition, the training policies of the City of Los Angeles were not
10   adequate to train its officers to handle the usual and recurring situations with which they
11   must deal, including but not limited to encounters with individuals on skid row who are
12   homeless and suffer from mental illness and/or drug addiction.  The City of Los Angeles
13   knew that its failure to adequately train its officers to interact with homeless individuals
14   on skid row suffering from mental illness and/or drug addiction made it highly predictable
15   that its officers would engage in conduct that would deprive persons such as Mr. Keunang
16   of their rights. The City of Los Angeles was thus deliberately indifferent to the obvious
17   consequences of its failure to train its officers adequately.

18        73.    Defendant City of Los Angeles' official policies and/or longstanding
19   practices or customs, including but not limited to its training policies, caused the
20   deprivation of the constitutional rights of Charly Keunang by Officers Syed, Martinez,
21   Torres, Volasgis, and the other involved officers; that is, the City of Los Angeles's official
22   policies and/or longstanding practices or customs are so closely related to the deprivation
23   of Mr. Keunang's rights as to be the moving force that caused his injuries.

24        74.    LAPD Chief Charlie Beck, a final policymaker for the City of Los Angeles,
25   ratified the actions and omissions of the Defendant Officers and the other involved
26   officers in that he had knowledge of and made a deliberate choice to approve their
27   unlawful acts and omissions.
28   \\\

FIRST AMENDED COMPLAINT          -18-

**FOURTH CAUSE OF ACTION**

**42 U.S.C. § 1983 – SURVIVAL ACTION**

**(First and Fourteenth Amendments: Retaliation for Speech)**

**(By - Estate of Charly Leundeu Keunang)**

**(Against – All Defendants)**

75.     Plaintiff realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as thought fully set forth herein.

76.     This claim for relief arose in Charly Keunang's favor, and Charly Keunang would have been the Plaintiff with respect to this claim for relief had he lived.

77.     All of the acts of Defendants and the persons involved were done under color of state law.

78.     The acts of the Officer Defendants relating to the unlawful entry and use of force, including but not limited to the use of deadly force, deprived Charly Keunang of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the First Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, retaliating against him for exercising his First Amendment right to freedom of speech and expression.

79.     On information and belief, Charly Keunang engaged in constitutionally protected speech by repeatedly pleading to the officers, "Let me express myself," and "If you let me express myself, maybe you may have a chance to explain why you're doing this right now."

80.     On information and belief, Charly Keunang engaged in constitutionally protected expressive conduct by crawling back into his tent after speaking with the officers.

81.     This action, together with Charly Keunang's statements, angered the officers and motivated them to retaliate by entering and firing their tasers into his tent, attempting to collapse the tent with Mr. Keunang inside, dragging him out of the tent, and repeatedly

1   tasing and punching Mr. Keunang before shooting him to death.

2   82.   Mr. Keunang's protected speech and conduct was a substantial or motivating

3   factor in the Defendant Officers' decision to retaliate. This was demonstrated by, among

4   other things, the fact that the Officer Defendants' actions occurred immediately following

5   Charly Keunang's protected activities.

6   83.   As a direct and proximate result of the aforementioned acts of Defendants,

7   Mr. Keunang sustained and incurred damages for a measurable period of time before his

8   death, including pain and suffering, emotional injury, and a loss of the enjoyment of life

9   and other hedonic damages as he lay writhing in pain and bleeding to death on the streets

10  of Los Angeles in the view of bystanders and Defendant police officers who did nothing

11  to come to his aid.

12  84.   In doing the foregoing wrongful acts, Defendants, and each of them, acted in

13  reckless and callous disregard for the constitutional rights of Charly Keunang. The

14  wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus

15  warranting the award of punitive damages against each individual Officer Defendant (but

16  not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future

17  misconduct.

18  85.   The Officer Defendants and the other involved officers acted pursuant to

19  expressly adopted official policies or longstanding practices or customs of the City of Los

20  Angeles.  These include policies and longstanding practices or customs on protected

21  speech, warrantless entries, and the use of force, including lethal force, in situations

22  including but not limited to encounters with individuals on skid row who are homeless

23  and suffer from mental illness and/or drug addiction.

24  86.   In addition, the training policies of the City of Los Angeles were not

25  adequate to train its officers to handle the usual and recurring situations with which they

26  must deal, including but not limited to encounters with individuals on skid row who are

27  homeless and suffer from mental illness and/or drug addiction.  The City of Los Angeles

28  knew that its failure to adequately train its officers to interact with homeless individuals

on skid row suffering from mental illness and/or drug addiction made it highly predictable that its officers would engage in conduct that would deprive persons such as Mr. Keunang of their rights. The City of Los Angeles was thus deliberately indifferent to the obvious consequences of its failure to train its officers adequately.

87.      Defendant City of Los Angeles' official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of Charly Keunang by Officers Syed, Martinez, Torres, Volasgis, and the other involved officers; that is, the City of Los Angeles's official policies and/or longstanding practices or customs are so closely related to the deprivation of Mr. Keunang's rights as to be the moving force that caused his injuries.

88.      LAPD Chief Charlie Beck, a final policymaker for the City of Los Angeles, ratified the actions and omissions of the Defendant Officers and the other involved officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.

## FIFTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – SURVIVAL ACTION

### (Fourth and Fourteenth Amendments: Failure to Intervene)

### (By - Estate of Charly Leundeu Keunang)

### (Against – All Defendants)

89.      Plaintiff realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

90.      This claim for relief arose in the Mr. Keunang's favor, and Mr. Keunang would have been the plaintiff with respect to this claim for relief had he lived.

91.      All of the acts of Defendants and the persons involved were done under color of state law.

92.      The acts and omissions of the Officer Defendants deprived Charly Keunang of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth Amendment of the United

States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, making an unlawful warrantless entry into the tent which Mr. Keunang used as habitation without exigent circumstances, consent, or probable cause, and subjecting Mr. Keunang to unreasonable and excessive force, including but not limited to lethal force, by beating, tasing, and shooting Mr. Keunang to death without justification.

93.     Plaintiffs are informed and believe and thereon allege that, at all relevant times herein mentioned, Defendants Syed, Martinez, Torres and Volasgis were present and had a realistic and reasonable opportunity to intervene to prevent the unlawful entry and the use of excessive force by their fellow officers against Mr. Keunang, but neglected to do so.

94.     As a direct and proximate result of the aforementioned acts and omissions of the Officer Defendants, Mr. Keunang sustained and incurred damages for a measurable period of time before his death, including pain and suffering, emotional injury, and a loss of the enjoyment of life and other hedonic damages as he lay writhing in pain and bleeding to death on the streets of Los Angeles in the view of bystanders and Defendant police officers who did nothing to come to his aid.

95.     In doing the foregoing wrongful acts and omissions, Defendants, and each of them, acted in reckless and callous disregard for the constitutional rights of Charly Keunang. The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of punitive damages against each individual Officer Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

96.     The Officer Defendants and the other involved officers acted pursuant to expressly adopted official policies or longstanding practices or customs of the City of Los Angeles.  These include policies and longstanding practices or customs on warrantless entries and the use of force, including lethal force, and on intervening to prevent such violations by other Officers, in situations including but not limited to encounters with

individuals on skid row who are homeless and suffer from mental illness and/or drug addiction.

97.     In addition, the training policies of the City of Los Angeles were not adequate to train its officers to handle the usual and recurring situations with which they must deal, including but not limited to encounters with individuals on skid row who are homeless and suffer from mental illness and/or drug addiction and intervening to prevent the violations of these individuals' constitutional violations by other officers.  The City of Los Angeles knew that its failure to adequately train its officers made it highly predictable that its officers would engage in conduct that would deprive persons such as Mr. Keunang of their rights. The City of Los Angeles was thus deliberately indifferent to the obvious consequences of its failure to train its officers adequately.

98.     Defendant City of Los Angeles' official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of Charly Keunang by Officers Syed, Martinez, Torres, Volasgis, and the other involved officers; that is, the City of Los Angeles's official policies and/or longstanding practices or customs are so closely related to the deprivation of Mr. Keunang's rights as to be the moving force that caused his injuries.

99.     LAPD Chief Charlie Beck, a final policymaker for the City of Los Angeles, ratified the actions and omissions of the Defendant Officers and the other involved officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.

## SIXTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – WRONGFUL DEATH
### (Fourteenth Amendment – Denial of Substantive Due Process
### Right to Familial Relationship)
### (By - Plaintiffs Heleine Tchayou and Isaac Keunang)
### (Against – All Defendants)

100.     Plaintiffs reallege and incorporate by reference each and every allegation

1  contained in the foregoing paragraphs as though fully set forth herein.

2      101.    All of the acts of Defendants and the persons involved were done under color

3  of state law.

4      102.    The acts and omissions of the Officer Defendants deprived Heleine Tchayou

5  and Isaac Keunang of rights, privileges, and immunities secured by the Constitution and

6  laws of the United States, including but not limited to their rights under the Fourteenth

7  Amendment of the United States Constitution by, among other things, depriving Plaintiffs

8  of their right to a familial relationship with their son without due process of law by their

9  use of unreasonable, unjustified lethal force. Defendants' use of lethal force shocks the

10 conscience.

11     103.    As a direct and proximate result of the foregoing wrongful acts, Defendants,

12 and each of them, Plaintiffs sustained general damages, including grief, emotional distress

13 and pain and suffering, loss of comfort and society, and special damages, including loss of

14 support, in an amount in accordance with proof.

15     104.    In doing the foregoing wrongful acts and omissions, Defendants, and each of

16 them, acted in reckless and callous disregard for the constitutional rights of Plaintiffs

17 Heleine Tchayou and Isaac Keunang and the Decedent. The wrongful acts, and each of

18 them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of

19 punitive damages against each individual Officer Defendant (but not the entity Defendant)

20 in an amount adequate to punish the wrongdoers and deter future misconduct.

21     105.    The Officer Defendants and the other involved officers acted pursuant to

22 expressly adopted official policies or longstanding practices or customs of the City of Los

23 Angeles.  These include policies and longstanding practices or customs on warrantless

24 entries and the use of force, including lethal force, in situations including but not limited

25 to encounters with individuals on skid row who are homeless and suffer from mental

26 illness and/or drug addiction.

27     106.    In addition, the training policies of the City of Los Angeles were not

28 adequate to train its officers to handle the usual and recurring situations with which they

FIRST AMENDED COMPLAINT          -24-

must deal, including but not limited to encounters with individuals on skid row who are homeless and suffer from mental illness and/or drug addiction.  The City of Los Angeles knew that its failure to adequately train its officers to interact with homeless individuals on skid row suffering from mental illness and/or drug addiction made it highly predictable that its officers would engage in conduct that would deprive persons such as Decedent, and thus Plaintiffs Heleine Tchayou and Isaac Keunang, of their rights. The City of Los Angeles was thus deliberately indifferent to the obvious consequences of its failure to train its officers adequately.

107.    Defendant City of Los Angeles' official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of Plaintiffs Heleine Tchayou and Isaac Keunang and Decedent by Officers Syed, Martinez, Torres, Volasgis, and the other involved officers; that is, the City of Los Angeles's official policies and/or longstanding practices or customs are so closely related to Mr. Keunang's injuries and death and thus the deprivation of the rights of Plaintiffs Heleine Tchayou and Isaac Keunang as to be the moving force causing those injuries.

108.    LAPD Chief Charlie Beck, a final policymaker for the City of Los Angeles, ratified the actions and omissions of the Defendant Officers and the other involved officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.

## SEVENTH CAUSE OF ACTION

### Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.* – SURVIVAL ACTION

### (By - All Plaintiffs)

### (Against - Defendant City of Los Angeles)

109.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

110.    Congress enacted the ADA upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms for

discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

111.    In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

112.    Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

113.    The U.S. Department of Justice's regulations implementing Title II, 28 C.F.R. § 35.160, require public entities to take appropriate steps to ensure that communications with members of the public with disabilities are as effective as communications with others.

114.    At all times relevant to this action, Defendant City of Los Angeles was a public entity within the meaning of Title II of the ADA and provided programs, services, and activities to the general public.

115.    The U.S. Department of Justice, Civil Rights Division, Disability Rights section has published, "Commonly Asked Questions About the Americans with Disabilities Act and Law Enforcement," a document in which the U.S. Department of Justice provides guidelines in the interpretation of Title II of the ADA ("the Guidelines"). In the Guidelines, the Department of Justice notes that the ADA affects virtually everything that police officers and deputies do, including providing emergency medical services, arresting, booking, and holding suspects, and other duties.

116.    At all times relevant to this action, Charly Keunang was a qualified individual in that he was a citizen of the State of California and resident in the City of Los Angeles and thereby entitled and qualified to receive and participate in the programs,

1    services, and activities provided by Defendant City of Los Angeles.

2         117.    At all relevant times, Mr. Keunang was a person with disability within the

3    meaning of Title II of the ADA, in that he suffered from a mental illness which at times

4    caused him to act out, and resulted in substantial limitations in his mental and emotional

5    processes such as thinking, concentrating, and interacting with others.

6         118.    On information and belief, at all times relevant to this action, Defendants

7    were made aware of decedent's disability through, for example, the initial complaint

8    describing Mr. Keunang as "mentally ill." In addition, on information and belief, at all

9    relevant times the Los Angeles Police Department had knowledge that a very large

10   percentage of the homeless living on the streets of Los Angeles suffer from some form of

11   mental illness and/or drug addiction.

12        119.    This claim for relief arose in Mr. Keunang's favor, and Mr. Keunang would

13   have been a Plaintiff with respect to this claim for relief had he lived. In addition,

14   Plaintiffs Isaac Keunang, Heleine Tchayou, and Line Marquise Foming are each an

15   "person aggrieved" within the meaning of the ADA.

16        120.    During their encounter with Mr. Keunang, the Defendant Officers failed to

17   reasonably accommodate Mr. Keunang's disability, causing him to suffer greater injury in

18   that process than other seized persons. Through the acts and omissions of Defendant City

19   of Los Angeles and its agents and employees described herein, Defendant City of Los

20   Angeles violated Title II of the ADA by excluding Mr. Keunang from participation in, by

21   denying him the benefits of, and subjecting him to discrimination in the benefits and

22   services it provides to the general public. Specifically, the Defendant Officers needlessly

23   and recklessly escalated the situation with Mr. Keunang by firing their tasers into Mr.

24   Keunang's tent and collapsing the tent on top of him while he waited peacefully inside, all

25   without justification or any reasonable basis and without taking into account his mental

26   illness. Rather than take these unjustified, unreasonable, and overly provocative steps, the

27   Officer Defendants could have allowed the situation to defuse sufficiently, and thus avoid

28   subjecting Mr. Keunang to greater injury compared to other arrestees.

FIRST AMENDED COMPLAINT          -27-

121.     Plaintiffs are informed, believe, and thereon allege that Defendant City of Los Angeles and its agents and employees have failed and continue to fail to take into account and provide reasonable accommodations for persons with mental disabilities by failing to:

    a.   Adopt and enforce policies and procedures for communicating effectively, controlling, and interacting with persons with mental disabilities;

    b.   Adopt and enforce policies and procedures for providing persons with mental disabilities access to medical facilities, including the provision of employees with medical training and medical resources to communicate, interact with, and control such persons;

    c.   Train and supervise City of Los Angeles and LAPD officers and employees to communicate effectively, control, and interact with persons with mental disabilities;

    d.   Train and supervise City of Los Angeles and LAPD officers and employees regarding the cognition and behavior of persons with mental disabilities; and

    e.   Train and supervise City of Los Angeles and LAPD officers and employees that they should not use force, or put themselves in positions where the use of force may become necessary without first notifying and obtaining the assistance of persons who have the requisite training and experience in communicating effectively with and controlling and interacting with persons with mental disabilities.

122.     As a direct and proximate result of the aforementioned acts, including but not limited to Defendant's deliberate indifference to the violation of Mr. Keunang's federally protected rights, Mr. Keunang suffered great pain, suffering, and death, and Plaintiffs have suffered and continue to suffer humiliation, hardship, anxiety, indignity, and severe mental and emotional anguish.

FIRST AMENDED COMPLAINT                                    -28-

123.     Pursuant to 42 U.S.C. § 12133, Plaintiffs are entitled to recover the compensatory damages described herein, and reasonable attorneys' fees and costs incurred in bringing this action.

## EIGHTH CAUSE OF ACTION

### Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 – SURVIVAL ACTION

### (By - All Plaintiffs)

### (Against - Defendant City of Los Angeles)

124.     Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

125.     Section 504 of the Rehabilitation Act of 1973 provides in pertinent part: "[N]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits, or be subjected to discrimination under any program or activity receiving federal financial assistance ..." 29 U.S.C. § 794.

126.     Charly Keunang, at all times relevant herein, was a qualified individual with a disability within the meaning of the Rehabilitation Act because he suffered from a mental illness, which at times caused him to act out, and resulted in substantial limitations in his mental and emotional processes such as thinking, concentrating, and interacting with others. *See* 29 U.S.C. § 705(20)(B).

127.     A claim for relief arose in Mr. Keunang's favor, and Mr. Keunang would have been a Plaintiff with respect to this claim for relief had he lived. In addition, Plaintiffs Isaac Keunang, Heleine Tchayou, and Line Marquise Foming are each an "person aggrieved" within the meaning of 29 U.S.C. § 794a(a)(2).

128.     At all times relevant to this action Defendant City of Los Angeles was a recipient of Federal funding within the meaning of the Rehabilitation Act.

129.     Through their acts and omissions described herein, defendant City of Los Angeles has violated the Rehabilitation Act, including all applicable implementing regulations, by excluding Mr. Keunang, from participation in, denying him the benefits of,

FIRST AMENDED COMPLAINT                    -29-

and subjecting him to discrimination in the benefits and services it provides to the general public.

130.     As a direct and proximate result of the aforementioned acts, including but not limited to Defendant's deliberate indifference to the violation of Mr. Keunang's federally protected rights, Mr. Keunang suffered great pain, suffering, and death, and Plaintiffs have suffered and continue to suffer humiliation, hardship, anxiety, indignity, and severe mental and emotional anguish.

131.     Pursuant to 29 U.S.C. § 794(a), Plaintiffs are entitled to recover the damages described in this Complaint and reasonable attorneys' fees and costs incurred in bringing this action.

## NINTH CAUSE OF ACTION
### NEGLIGENCE – WRONGFUL DEATH
**(By – Plaintiffs Heleine Tchayou and Isaac Keunang)**
**(Against – All Defendants)**

132.     Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

133.     Charly Leundeu Keunang had no predeceased spouse or domestic partner and has no surviving spouse, domestic partner, or issue. Accordingly, Plaintiffs Heleine Tchayou and Isaac Keunang, as Charly Leundeu Keunang's surviving parents, are entitled to his property by intestate succession pursuant to Probate Code § 6402, and are thus proper defendants for wrongful death claims under Civil Code § 377.60(a).

134.     Charly Leundeu Keunang's death was a direct and proximate result of the aforementioned wrongful and/or negligent acts and/or omissions of the Officer Defendants. The Officer Defendants' acts and/or omissions thus were also a direct and proximate cause of Plaintiffs' injuries and damages, as alleged herein.

135.     As a direct and proximate result of the Officer Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs incurred funeral and burial expenses, including transporting Mr. Keunang's body back to Cameroon to join his ancestors, in an amount to

1    be proved at trial.

2    136.    As a direct and proximate result of Defendants' wrongful and/or negligent

3    acts and/or omissions, Plaintiffs suffered the loss of Mr. Keunang's services, society, care,

4    comfort, support, protection, gifts and benefits, as well as the loss of the present value of

5    his future services to them for the remainder of their lives.

6    137.    Defendant City of Los Angeles is vicariously liable for its employees'

7    wrongful and/or negligent acts and/or omissions.

8    138.    Plaintiffs are further entitled to recover prejudgment interest.

9    139.    Defendants Syed, Martinez, Torres, and Volasgis acted with conscious

10   disregard of Mr. Keunang's rights.  Said Defendants' conduct was willful, wanton,

11   malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and

12   punitive damages to punish the wrongful conduct alleged herein and to deter such conduct

13   in the future.

## TENTH CAUSE OF ACTION

### NEGLIGENCE – SURVIVAL ACTION

### (By – Plaintiff Estate of Charly Leundeu Keunang)

### (Against – All Defendants)

18   140.    Plaintiffs reallege and incorporate by reference each and every allegation

19   contained above as though fully set forth herein.

20   141.    On or about March 1, 2015, after causes of action arose in his favor,

21   Decedent Mr. Keunang would have been a Plaintiff in this action had he survived the

22   injuries he sustained.

23   142.    The conduct of Defendants as set forth herein, was tortious in that

24   Defendants breached their duty of care to Mr. Keunang an unarmed man besieged by six

25   heavily armed police officers. Additionally, on information and belief, Defendants had

26   reason to believe Mr. Keunang suffered from a mental illness. Until they violently

27   attacked and provoked him, Mr. Keunang was acting in a calm noncombative manner. As

28   a result of the conduct of the Defendants as alleged herein, Mr. Keunang sustained and

incurred damages for a measurable period of time him before his death, writhing in pain and bleeding to death on the streets of Los Angeles in the view of bystanders and Defendant police officers who did nothing to come to his aid. The Estate of Mr. Keunang, therefore, seeks recovery for personal property damages, and all other related expenses, damages, and losses, as permitted by § 377.34 of the Code of Civil Procedure, against Defendants, according to proof at trial.

143.    The City of Los Angeles is vicariously liable for the actions of the Officer Defendants.

144.    Defendants Syed, Martinez and Torres acted with conscious disregard of Mr. Keunang's rights.  Said Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying to Plaintiff Estate of Charly Leundeu Keunang an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## ELEVENTH CAUSE OF ACTION

### ASSAULT – SURVIVAL ACTION

### (By – Plaintiff Estate of Charly Leundeu Keunang)

### (Against – All Defendants)

145.    Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

146.    On or about March 1, 2015, after causes of action arose in his favor, Decedent Mr. Keunang would have been a Plaintiff in this action had he survived the injuries he sustained.

147.    Defendants Syed, Martinez, Torres, and Volasgis acted, intending to cause harmful or offensive contact with Mr. Keunang, and threatened to touch Mr. Keunang in a harmful or offensive manner.

148.    Mr. Keunang reasonably believed that he was about to be touched in a harmful or offensive manner, and it reasonably appeared to Mr. Keunang that Defendants were about to carry out their threats.

149.     Mr. Keunang did not consent to Defendants' conduct.

150.     Mr. Keunang was harmed.

151.     Defendants' conduct was a substantial factor in causing Mr. Keunang's harm.

152.     The City of Los Angeles is vicariously liable for the actions of the Officer Defendants.

153.     Defendants Syed, Martinez, Torres, and Volasgis acted with conscious disregard of Mr. Keunang's rights. Said Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying to Plaintiff Estate of Charly Leundeu Keunang an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## TWELFTH CAUSE OF ACTION

### BATTERY – SURVIVAL ACTION

### (By – Plaintiff Estate of Charly Leundeu Keunang)

### (Against – All Defendants)

154.     Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

155.     On or about March 1, 2015, after causes of action arose in his favor, Decedent Mr. Keunang would have been a Plaintiff in this action had he survived the injuries he sustained.

156.     Defendants Syed, Martinez, Torres, and Volasgis intentionally touched Mr. Keunang, or caused him to be touched.

157.     Defendants Syed, Martinez, Torres, and Volasgis used unreasonable force. On information and belief, Defendants had reason to believe Mr. Keunang suffered from a mental illness. Until they violently attacked and provoked him, Mr. Keunang was acting in a calm and noncombative manner.

158.     Mr. Keunang did not consent to the use of that force.

159.     Mr. Keunang was harmed. As a result of the conduct of the Defendants as alleged herein, Mr. Keunang sustained and incurred damages for a measurable period of

1   time him before his death, writhing in pain and bleeding to death on the streets of Los

2   Angeles in the view of bystanders and Defendant police officers who did nothing to come

3   to his aid. The Estate of Mr. Keunang, therefore, seeks recovery for personal property

4   damages, and all other related expenses, damages, and losses, as permitted by § 377.34 of

5   the Code of Civil Procedure, against Defendants, according to proof at trial.

6       160.    The use of unreasonable force by Defendants Syed, Martinez, Torres, and

7   Volasgis was a substantial factor in causing Mr. Keunang's harm.

8       161.    The City of Los Angeles is vicariously liable for the actions of the Officer

9   Defendants.

10      162.    Defendants Syed, Martinez, Torres, and Volasgis acted with conscious

11  disregard of Mr. Keunang's rights. Said Defendants' conduct was willful, wanton,

12  malicious, and oppressive, thereby justifying to Plaintiff Estate of Charly Leundeu

13  Keunang an award of exemplary and punitive damages to punish the wrongful conduct

14  alleged herein and to deter such conduct in the future.

## THIRTEENTH CAUSE OF ACTION

### CALIFORNIA CONSTITUTION, ART. 1, § 13 – SURVIVAL ACTION

#### (By – Plaintiff Estate of Charly Leundeu Keunang)

#### (Against – All Defendants)

19      163.    Plaintiffs reallege and incorporate by reference each and every allegation

20  contained above as though fully set forth herein.

21      164.    On or about March 1, 2015, after causes of action arose in his favor,

22  Decedent Mr. Keunang would have been a Plaintiff in this action had he survived the

23  injuries he sustained.

24      165.    The conduct of Defendants as set forth herein, violated Mr. Keunang's rights

25  under Article 1, § 13 of the California Constitution in that Defendants unlawfully seized

26  Mr. Keunang, unlawfully entered the tent which he used for habitation, and unlawfully

27  used excessive force, including lethal force. Additionally, on information and belief,

28  Defendants had reason to believe Mr. Keunang suffered from a mental illness.  Until they

violently attacked and provoked him, Mr. Keunang was acting in a calm noncombative manner. As a result of the conduct of the Defendants as alleged herein, Mr. Keunang sustained and incurred damages for a measurable period of time him before his death, writhing in pain and bleeding to death on the streets of Los Angeles in the view of bystanders and Defendant police officers who did nothing to come to his aid. The Estate of Mr. Keunang, therefore, seeks recovery for personal property damages, and all other related expenses, damages, and losses, as permitted by § 377.34 of the Code of Civil Procedure, against Defendants, according to proof at trial.

166.     The City of Los Angeles is vicariously liable for the actions of the Officer Defendants.

167.     Defendants Syed, Martinez and Torres and Does 1-20 acted with conscious disregard of Mr. Keunang's rights. Said Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying to Plaintiff Estate of Charly Leundeu Keunang an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## FOURTEENTH CAUSE OF ACTION

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (By – Plaintiffs Heleine Tchayou and Line Marquise Foming)

### (Against – Defendant City of Los Angeles)

168.     Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

169.     Once re-united with their son and brother, Plaintiffs Tchayou and Foming took care to be in almost daily communication and contact with Mr. Keunang, so as to steady him in his resolve to change his life around and provide him the love, encouragement and emotional support he required. This communication took the form of texting and phone calls, in addition to the personal trip Mr. Keunang made to Boston to reunite with his mother and sister in June 2014.

170.     On the day before his death, Mr. Keunang texted his sister his intent to

telephone her the next day, so as to speak to her and their mother, Plaintiff Tchayou. When her brother did not call as promised, Plaintiff Foming unsuccessfully attempted to reach him. Worried, Plaintiffs spent days in anxious concern about Mr. Keunang, staving off fears stoked by his sudden and inexplicable silence that he had "disappeared" again.

171.    Completely unaware of the significance of what they saw, Plaintiffs watched the videotaped news coverage of Mr. Keunang's fatal shooting and painful death by Defendant City's agents and employees.

172.    Plaintiffs also watched the graphic cell phone recordings of Mr. Keunang's fatal shooting and painful death which had been posted online.

173.    Despite the fact that Defendant City, and Doe Defendants who are City employees, knew of the existence and whereabouts of Plaintiffs and their kinship to Mr. Keunang, Defendants failed and refused to notify Mr. Keunanag's next of kin. Rather, his body was transported to the morgue.

174.    Defendant City and Doe Defendants never did notify Plaintiffs of the death of their son.  Rather, Plaintiffs learned of Mr. Keunang's death and the circumstances surrounding it first and only from relatives living thousands of miles away in Cameroon.

175.    Defendant City is vicariously liable for the acts and omissions of the Doe Defendants who are City employees.

176.    The acts and failures to act as alleged herein caused severe anxiety, pain, suffering and emotional distress and injury to Plaintiffs and each of them and Plaintiffs are therefore entitled to damages in an amount to be proven at trial.

### FIFTEENTH CAUSE OF ACTION
### BANE ACT, CIVIL CODE § 52.1
**(By – Plaintiff Estate of Charly Leundeu Keunang)**
**(Against – All Defendants)**

177.    Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

178.    Article I, § 13 of the California Constitution and the Fourth Amendment to

the United States Constitution guarantee the right of persons to be free from arrests, searches, and warrantless entries without probable cause, and the use of unnecessary and excessive force on the part of law enforcement officers. Defendants, by engaging in the wrongful acts and failures to act alleged herein, intentionally and deliberately denied each of these rights to Mr. Keunang by threats, intimidation, or coercion, thus giving Plaintiffs a claim for damages pursuant to Cal. Civ. Code § 52.1. Specifically, Defendants (1) unlawfully seized Mr. Keunang without probable cause, (2) unlawfully made a warrantless entry into the tent in which Mr. Keunang used as habitation, without probable cause, and (3) used excessive force against Mr. Keunang, including lethal force, by beating, tasing, and repeatedly shooting him, resulting in his death. Defendants' unlawful actions were a substantial factor causing Mr. Keunang to suffer severe injuries and suffering prior to his death. The City of Los Angeles is vicariously liable for its officers' misconduct.

179.    Article I, § 2 of the California Constitution and the First Amendment to the United States Constitution guarantee the right of persons to engage in protected speech. Defendants, by engaging in the wrongful acts and failures to act alleged herein, intentionally and deliberately denied this right to Mr. Keunang by threats, intimidation, or coercion, thus giving Plaintiffs a claim for damages pursuant to Cal. Civ. Code § 52.1. Specifically, Defendants retaliated against Mr. Keunang for his exercise of his constitutional right to engage in protected speech, and such retaliation was a substantial or motivating factor for their conduct. Defendants' unlawful actions were a substantial factor causing Mr. Keunang to suffer severe injuries and suffering prior to his death. The City of Los Angeles is vicariously liable for its officers' misconduct.

180.    As the direct and legal result of Defendants' conduct, Plaintiffs suffered and will continue to suffer damages, including but not limited to those set forth above, and are entitled to statutory damages under Cal. Civ. Code § 52, as well as compensatory and punitive damages and attorneys' fees.

\\\

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

1.      For compensatory, general and special damages against each Defendant, jointly and severally, amounts to be proven at trial;

2.      Punitive and exemplary damages against individually named Defendants Syed, Martinez, Torres, and Volasgis in an amount appropriate to punish Defendant(s) and deter others from engaging in similar misconduct;

3.      Prejudgment interest;

4.      For costs of suit and reasonable attorneys' fees and costs as authorized by statute or law;

5.      For restitution as the Court deems just and proper;

6.      For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury in this action.


Dated: March 20, 2017                    Respectfully Submitted,

                                         DORDI WILLIAMS COHEN LLP

                                         NSAHLAI LAW FIRM

                                         HADSELL STORMER & RENICK LLP



                                         By:  ____/s/ Joshua Piovia-Scott____
                                              Barbara Enloe Hadsell
                                              Dan Stormer
                                              Joshua Piovia-Scott
                                              Brian Olney
                                              Attorneys for Plaintiffs